**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                               |     |                              |
| ----------------------------- | --- | ---------------------------- |
|                               | :   |                              |
| **UNITED STATES OF AMERICA**  | :   |                              |
|                               | :   |                              |
| **v.**                        | :   |                              |
|                               | :   | **Case No.: 23-CR-366 (ACR)** |
| **BENJAMIN COHEN,**           | :   |                              |
|                               | :   |                              |
| **Defendant.**                | :   |                              |
|                               | :   |                              |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Benjamin Cohen to 24 months of incarceration (the bottom of the applicable Guidelines range), 3 years of supervised release, $2,000 in agreed-to restitution, and a $100 special assessment.

## I.    INTRODUCTION

The defendant, Benjamin Cohen, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Cohen was one of the first rioters who breached the police line on the West Front of the Capitol as part of a mob that swarmed police officers and surged past barriers toward the building. As he advanced toward the Capitol, Cohen specifically targeted and assaulted multiple police officers, shoving and striking them with his hands. He later repeatedly entered the Lower West Terrace "Tunnel"—the site of some of the most violent moments on January 6—where he twice joined in a "heave-ho" effort against officers who were desperately trying to prevent the mob from entering the Capitol building. After leaving the Tunnel and occupying the inaugural stage, Cohen supported other rioters who were still inside and who continued to battle the police. Cohen then entered the Capitol building through a broken window adjacent to the Tunnel's entrance.

The government recommends that the Court sentence Cohen to 24 months of incarceration. A 24-month sentence reflects the gravity of Cohen's conduct, but also acknowledges his admission of guilt and other mitigating factors.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense ("SOO") filed in this case, ECF 32, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Cohen's Role in the January 6, 2021 Attack on the Capitol

It was Cohen's idea to travel to D.C. on January 6, 2021. He attended the rally at the Ellipse with his mother, then joined the large crowd that marched toward the Capitol. Once on the Capitol

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

grounds, he left his mother and joined the mob gathered on the West Plaza. He made his way to the front of the mob, where officers of the U.S. Capitol Police (USCP) had set up a bike-rack barrier and officers from the USCP and Washington, D.C. Metropolitan Police Department (MPD) had formed a police line. Cohen positioned himself at the front of the mob, right behind the bike racks, face to face with the officers. *See* Images 1 and 2; Exhibits 1 and 4.[2]



*Image 1: Cohen at the Front of the Mob*

---

[2] The government's video exhibits will be provided separately to the Court and defense counsel.



*Image 2: Cohen at the Front of the Mob*

At 2:28 p.m., members of the mob pushed through barriers on the West Plaza and attacked the officers. Cohen joined the front line of rioters breaching the police line and moved toward a group of officers. Cohen promptly began assaulting the group of officers in front of him, striking and shoving them with his hands. *see* Images 3 and 4; Exhibits 2 and 3.



*Image 3: Open-Source Video of Cohen Assaulting an Officer*



*Image 4: Open-Source Video of Cohen Assaulting an Officer*

Moments later, Cohen looked around—searching for police—then moved toward officers

and resumed striking them with his hands. SOO ¶ 9; *see* Images 5 and 6; Exhibits 2, 3, and 4.



*Image 5: MPD Body-Worn Camera Footage of Cohen Assaulting an Officer*



*Image 6: MPD Body-Worn Camera Footage of Cohen Assaulting an Officer*

After rioters overran the police line, forcing the officers to retreat, Cohen joined the mob that advanced onto the Lower West Terrace. By this time, USCP and MPD officers had reformed a police line to defend an entrance to the U.S. Capitol on the Lower West Terrace known as the "Tunnel." Over the course of more than two hours, members of the mob threw projectiles at police, struck police with weapons, sprayed police with chemical irritants, used their arms and torsos to push against the police, and stole items from the police defending the Tunnel, particularly riot shields. *See* SOO ¶ 10.

At approximately 2:48 p.m., Cohen entered the Tunnel as rioters ahead of him were attacking police officers. *See* Image 7; Exhibits 5 and 6.



*Image 7: CCTV Footage of Cohen Entering the Tunnel*

Cohen joined the Tunnel mob—briefly leaving then returning after another rioter activated a fire extinguisher near Cohen's head, and, at approximately 2:51 p.m., joined the coordinated thrust of the mob against the officers by placing his hands on the back of the rioter in front of him and pushing forward. The rioters shouted "heave-ho" in unison to coordinate their joint pushes against the police. SOO ¶ 11.

After joining the 2:51 "heave-ho" effort, Cohen moved back and returned to the Tunnel's entrance. Approximately one minute later, Cohen reversed course and moved back into the Tunnel. *See* Image 8; Exhibits 5, 6, 7.



*Image 8: Cohen in the Tunnel*

Cohen watched as rioters shined strobe lights at officers in an effort to distract them or impair their vision, threw objects at officers, and used other means to disrupt the police line. At one point, Cohen observed another rioter to Cohen's left deploy a chemical spray against the police. SOO ¶ 12.

Cohen pushed ahead toward the front of the mob where rioters were directly engaged in physical altercations with the police officers. At approximately 2:56 p.m., a rush of additional rioters entered the Tunnel behind Cohen, and, at approximately 2:57 p.m., the mob—including Cohen—engaged in another "heave-ho" effort by moving their bodies in unison back and forth. *Id.* ¶ 13; *see* Image 9; Exhibit 7.



*Image 9: Cohen in the Tunnel*

By approximately 3:05 p.m., Cohen moved back toward the Tunnel's entrance and rinsed his eyes with a bottle of water to wash chemical spray from his eyes. Cohen then exited the Tunnel. He remained with the mob on the Lower West Terrace and Inaugural Stage for at least another hour. At approximately 4:00 p.m., he continued to assist rioters' efforts to push back into the Tunnel by once more pushing against rioters in front of him collectively with the mob. SOO ¶ 14. He then climbed through a broken window adjacent to the Tunnel's entrance, where he found himself inside an office where rioters were smashing furniture. *Id.* ¶ 15; *see* Image 10.



*Image 10: Cohen in a Capitol Building Office After Climbing Through a Broken Window*

### Cohen's Statements to the FBI

On January 30, 2023, FBI special agents and task force officers interviewed Cohen at his parents' home in Westport, Connecticut. During that interview, Cohen falsely stated that he did not physically engage with any police officers while on the Capitol grounds on January 6, 2021. Cohen further falsely stated that he did not enter the Capitol building. Cohen did acknowledge going onto the Capitol grounds after attending the rally at the Ellipse and admitted to being hit by some sort of chemical irritant.

## III.    THE CHARGES AND PLEA AGREEMENT

On October 18, 2023, a federal grand jury returned an indictment charging Benjamin Cohen with eight counts, including assaulting, resisting, or impeding officers, in violation of 18 U.S.C. § 111(a)(1). On, July 8, 2024, Cohen pleaded guilty to Count Two of the Indictment, which charged him with violating 18 U.S.C. § 111(a)(1).

## IV.    STATUTORY PENALTIES

Cohen now faces sentencing on Count Two of the Indictment, for assaulting, resisting, or impeding officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Cohen faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR accurately states the guidelines for Count Two, a violation of 18 U.S.C. § 111(a)(1), which is also set out in the plea agreement, ECF No. 30. As set out in the plea agreement, Cohen's acceptance of responsibility results in a three-point reduction from his total offense level. *See* Plea Agreement, ECF No. 30 at 3; *see also* U.S.S.G. § 3E1.1(a), (b).

11

The guidelines calculation is included below:

Count Two: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3E1.1(a) and (b) | Acceptance of Responsibility | -3 |
| | **Total** | **17** |

Pursuant to the plea agreement, the parties have agreed that the zero-point offender adjustment in U.S.S.G. § 4C1.1 does not apply because Cohen used violence or credible threats of violence in connection with the offense and therefore he is ineligible to receive the adjustment pursuant to U.S.S.G. § 4C1.1(a)(3). ECF No. 30 at 4.

The U.S. Probation Office calculated Cohen's criminal history as category I, which is not disputed. PSR ¶ 55–61. Accordingly, based on the government's calculation of the Cohen's total adjusted offense level, after acceptance of responsibility, at 17, Cohen's Guidelines imprisonment range is 24 to 30 months' imprisonment. Cohen's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. ECF No. 30 at 4.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Cohen's felonious and violent conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

the United States into a Constitutional crisis. Cohen engaged in violence specifically targeting police officers in two key locations at two key times: (1) the West Plaza just before 2:30 p.m., when the mob finally overran the plaza's police line, and (2) the Tunnel around 3:00 p.m. to approximately 4:00 p.m., when rioters waged an hours-long battle against police at that location. The nature and circumstances of Cohen's offense were of the utmost seriousness, and fully support the government's recommended sentence of 24 months' incarceration.

### B.  Cohen's History and Characteristics

Cohen is 22 years old and currently works as a cook at a yacht club in Connecticut. He is a high school graduate and receives professional education in welding. PSR ¶ 79. His employment history covers most, if not all, of his adult life. And while Cohen does not have a criminal history, he reported to the Probation Office that, on January 1, 2023, he was inebriated and got into a physical altercation at a bar which required hospital treatment. ¶ 70.

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

It was Cohen's decision to go to the U.S. Capitol in the first place. He chose to leave his mother behind and get closer to the building. He chose to furiously break past the police line during a key moment on the West Plaza and specifically seek out police officers to assault. Then, despite battling police, being hit with chemical spray, and having every opportunity to change course, Cohen choose to continue his fight. During another key moment in the riot, he decided to enter the Tunnel, continue battling the police, and join violent "heave ho" efforts. And when he finally left the Tunnel, he *still* chose to enter a Senate office through a broken window next to the Tunnel and then to remain on the inaugural stage, supporting the Tunnel fight from the exterior. These were not the actions of someone caught up in a moment or a victim of another's influence.

While the government appreciates how Cohen's conditions affect his life, they do not justify nor explain why he repeatedly sought out and committed political violence at the Capitol. Insofar as the stress of the day impacted his thinking and actions that day, nothing would have prevented him from leaving the Capitol, as opposed to attacking police. Indeed, the fact that Cohen falsely told investigators he did not encounter police or engage in violence that day underscores the fact that Cohen appreciated the criminal nature of his actions and his culpability.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Cohen's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Cohen also weighs heavily in favor of a term of incarceration.

Cohen did not come to Washington, D.C., and storm the Capitol on anyone's influence or plan—it was his idea, and he did not do a single thing he did not want to do. He left his mother, contributed to the violence in two of the Capitol's most dangerous areas that day, and then denied doing any of it to investigators, conscious of possible consequences.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and

weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Schmidt*, 23-cr-276 (ACR), the defendant was one of the first rioters to breach the outer perimeter of the restricted Capitol grounds at Peace Circle. After he and the mob

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

pushed down the first set of barricades, Schmidt stood on a wall of the Capitol and yelled to other rioters, "Who's House? Our House!" Schmidt then jumped over black metal fencing and moved to the front of the mob to confront police officers. Between 1:00 p.m. and 2:45 p.m., Schmidt physically battled multiple lines of police officers on the West Plaza by pushing against them with his back as he was pepper sprayed and hit with riot control devices. While on the West Plaza, Schmidt picked up a cylindrical object, believed to be a "selfie stick," and he threw it at the line of police officers who were battling with rioters, but it did not appear to have hit any police officers.

After almost two hours of battling the police officers, Schmidt made his way to the Upper West Terrace and entered the Capitol building. Schmidt traveled through the Rotunda, entered Statuary Hall, and exited the Capitol building through the East Foyer Doors at 2:51 p.m. He remained outside the East Foyer Doors and reentered the Capitol building through the same doors at approximately 3:15 p.m. Schmidt remained in the Capitol building this second time for approximately 15 minutes before he was removed by police officers at 3:30 p.m. Schmidt then remained on Capitol Grounds until the early evening hours of January 6, 2021.

Schmidt pleaded guilty to contributing to a civil disorder in violation of 18 U.S.C. § 231(a)(3). This Court agreed with the government's recommendation and sentenced Schmidt to 14 months' incarceration: the top of the applicable Guidelines range in that case. Cohen's case similarly requires a guidelines sentence, albeit at the bottom of his higher applicable range under § 111(a)(1), because he directly lashed out at and struck multiple officers, participated in multiple instances of "heave-ho" violence in and around the Tunnel, and lied about encountering officers and entering the Capitol in his interview with the FBI.

In *United States v. Devlyn Thompson*, 21-cr-641 (RCL), the defendant pled guilty to a violation of § 111(a)(1) and (b). Like Cohen, Thompson witnessed the violence on the West Plaza

and directly contributed to the violence in the Tunnel, where he struck one officer. Unlike Cohen, Thompson struck the officer with a baton—a dangerous weapon—and did not directly assault *multiple* officers, though he assisted other rioters in the Tunnel pass shields and other objects to the front of the mob. Thompson also provided extensive cooperation as part of his plea. Thompson also had a minor criminal history. ████████████████████████████████████████ ██████████████████████████████████ Thompson argued at sentencing that his ASD contributed to heightened suggestibility and weighed in favor of a non-incarceration sentence. Judge Lamberth ultimately sentenced Thompson to a guideline incarceration sentence—46 months in that case. As with Thompson, a guidelines sentence is appropriate for Cohen.

In *United States v. Matthew Brackley*, 24-cr-9 (CJN), Brackley pled guilty to a violation of 18 U.S.C. § 111(a)(1). Brackley entered the U.S. Capitol and tried at one point to physically shove past two police officers that attempted to stop him. Overall, Cohen's conduct is much more egregious than Brackley's, as Brackley did not seek out and strike multiple police officers on the West Plaza or help push against officers in the Tunnel. Judge Nichols sentenced Brackley to 15 months' incarceration even though his risk of recidivism was low to zero and he had significant community support and genuinely showed remorse.

In *United States v. Mark Ponder*, 21-cr-259 (TSC), Ponder pled guilty to a violation of 18 U.S.C. § 111(a)(1) and (b). Ponder committed multiple assaults and was involved in clashes with police in multiple locations. Though Ponder has a significant criminal history, his PSR also described significantly mitigating mental health and substance abuse struggles that Judge Chutkan agreed with defense counsel were "as severe as any I've seen in my career doing criminal law." Aug. 10, 2022 Tr., No. 21-cr-259, ECF No. 58. Judge Chutkan nevertheless sentenced Ponder to 63 months' imprisonment—the top of his guidelines range.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cohen must pay $2,000 in restitution, which reflects in part the role Cohen played in the riot on January 6.[8]  Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Cohen's restitution payment must be made to the Clerk of the Court,

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 118.

## VIII.    FINE

Cohen's convictions for violation of 18 U.S.C. § 111(a)(1) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Cohen's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months of incarceration (the bottom of the applicable Guidelines range), 3 years of supervised release, $2,000 in agreed-to restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant U.S. Attorney
DC Bar No. 1601102
nathaniel.whitesel@usdoj.gov
(202) 252-7759

*/s/ Terence A. Parker*
TERENCE A. PARKER
Trial Attorney (Detailee)
NY Bar No. 5775192
Terence.Parker3@usdoj.gov
(202) 431-8493